ROBERT C. SCHUBERT (rschubert@sjk.law) (SBN 62684)
AMBER L. SCHUBERT (aschubert@sjk.law) (SBN 278696)
DANIEL L.M. PULGRAM (dpulgram@sjk.law) (SBN 354569)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEXANDRA MURILLO, on behalf of herself and her minor child "W.A." and her minor child "H.A.",<br><br>*Plaintiff*,<br><br>v.<br><br>California Physicians' Service d/b/a Blue Shield of California,<br><br>*Defendant*. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Alexandra Murillo ("Plaintiff"), on behalf of herself, on behalf of her minor child "W.A.", on behalf of her minor child "H.A.", and on behalf of all others similarly situated alleges the following against Defendant California Physicians' Service d/b/a Blue Shield of California ("Defendant") upon personal knowledge as to her own acts, and based upon her investigation, her counsel's investigation, and information and belief as to all other matters.

**INTRODUCTION**

1. This is a Data Breach class action against Defendant California Physicians' Service d/b/a Blue Shield of California ("Blue Shield" or "Defendant") brought on behalf of current and former Blue Shield subscribers whose personally identifying information ("PII") and personal health information ("PHI") was stolen from a contractor Blue Shield hired and supplied with the PII and PHI. At least as early as April 2024, the contractor hired by Defendant, Young Consulting, LLC ("Young Consulting"), was breached and had subscriber data stolen in a ransomware attack. No subscriber was informed of the breach until late August 2024. Defendant had a duty to protect and secure sensitive subscriber data, including data provided to third parties, to sufficiently inform subscribers as soon as practicable of any data breach, and to abide by its own stated and agreed data security policies and procedures. Defendant's failures in these duties harmed Plaintiff and the class.

2. At all relevant times Defendant Blue Shield required healthcare subscribers, including Plaintiff, to provide highly sensitive PII and PHI to Defendant as a precondition for receiving healthcare services.

3. Defendant collects, stores, and maintains significant PII and PHI on its current and former subscribers.

4. Defendant shared significant PII and PHI from at least hundreds of thousands of current and former subscribers with Young Consulting, a risk management company.

5. On August 26, 2024, Young Consulting announced that its systems had been breached by a ransomware gang and that information on at least 954,177 subscribers had been compromised. The breach itself occurred at least as early as April 10, 2024, and Defendant stated it became aware of the breach on April 13, 2024.

6. According to news reports, the cyberattack was carried out by the "BlackSuit" ransomware gang, who claimed responsibility for the attack as early as May 7, 2024. It began releasing leaked sensitive information a few weeks later.[1]

7. The information breached includes at least the subscriber's full name, Social Security number, date of birth, and private medical insurance claim information.

8. "BlackSuit" claimed to leak a lot more than what Young Consulting disclosed on the notices to impacted individuals. Specifically, BlackSuit claimed the breached information also included contracts, presentations, employee passports, contacts, family details, medical examinations, financial audits, reports and payments, and various content taken from personal folders and network shares.[2]

9. On information and belief, Defendant did not send any notices to their subscribers who had been impacted by the data breach and instead waited for Young Consulting to release the information.

10. Defendant knew at least as early as June 28, 2024 that subscriber information was breached when it was informed by Young Consulting.[3] Defendant then further, inexplicably, failed to notify substantially any of their current or former subscribers of the breach and indeed did not even post a generalized announcement of the breach until August 26, 2024. That is the same day Young Consulting purports to have mailed data breach notifications to impacted subscribers, including Plaintiff.

11. Defendant is a major healthcare insurance company with thousands of employees and millions of members. Its revenue is easily in the billions of dollars. Defendant had the resources to adequately secure subscriber data and to vet third party service providers to ensure those service providers had adequate security.

12. Defendant is well aware that both it and the third-party services it utilizes are at high risk of attempted cyberattack due to the high value of the sensitive data. Indeed, Defendant

---

[1] https://www.bleepingcomputer.com/news/security/blacksuit-ransomware-stole-data-of-950-000-from-software-vendor/ (Last Accessed September 6, 2024)

[2] *Id.*

[3] https://youngconsulting.com/notice/youngconsulting-notice.html (Last Accessed September 6, 2024)

Blue Shield has had its subscriber data exposed in other data breaches, including a major data breach it announced less than a year prior to the Young Consulting Data Breach. Specifically, on November 17, 2023, Blue Shield announced that a "cybersecurity attack on vendor's files may have impacted Blue Shield of California Member Data." This data breach, which Defendant became aware of at least as early as September 1, 2023,[4] involved another third-party service provider it utilized—MOVEit. Defendant was fully aware of the risk that other breaches might occur involving third parties it provided information to.

13. Defendant is also a participant in the California Statewide Data Sharing Agreement.[5] This agreement sets forth numerous security and data sharing standards including requirements for responses to data breaches. Among other factors, Defendant participated in the statewide agreement which, among other things, states as follows:

> Breaches can be very serious events with potential for serious impact on Participants and the individuals whose Health and Social Services Information is breached. This policy requires each Participant to identify, notify, investigate and mitigate any Breach and, when detection of a Breach has occurred, to notify CDII and any Participants impacted by the Breach in accordance with the procedures herein. This policy shall be effective as of January 31, 2024.[6]

Defendant expressly acknowledged that data Breaches, such as the breach at issue here, can be very serious events with potential for serious impact on Participants and their individual subscribers whose information was breached. Defendant had full knowledge of the value of this information and the risk of a breach.

14. Despite Defendant's awareness of both the value and sensitivity of the data it safeguarded and serious risk that insufficient security practices by vendors presents, Defendant did not take sufficient steps to ensure that the data they provided to Young Consulting was secure. Defendant knew or should have known about the risk to the data they stored and

---

[4] https://news.blueshieldca.com/cybersecurity-attack-on-vendors-files-may-have-impacted-blue-shield-of-california-member-data (Last Accessed September 15, 2024)
[5] https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf (Last Accessed September 16, 2024) at 22.
[6] https://www.cdii.ca.gov/wp-content/uploads/2023/12/CalHHS_Breach-Notification-PP_Final_v1.0.1_12.11.23.pdf

processed, and the critical importance of adequate security measures in the face of increasing threats.

15. Despite knowing the risks, Defendant did not implement adequate security measures to protect subscribers' PHI and PII.

16. The failure to implement adequate data security measures in the face of the obvious threat profile made a data breach entirely foreseeable, and indeed probable. But for Defendant's failure ensure that their vendor, Young Consulting, had secure and encrypted servers and followed appropriate data isolation and compartmentalization practices, this breach would not have occurred.

17. Moreover, Defendant's failure to notify subscribers that they had been impacted by this data breach for at least two months after Defendant became aware of the breach harmed Plaintiff and made it more difficult for Plaintiff to take swift action to respond to the breach. Defendant's failure to timely notify subscribers also plainly violated their obligations under the Statewide Data Sharing Agreement that it is a participant in.

18. Plaintiff and class members have been harmed because they are at immediate risk of having their personal information used against them, including by means of fraud and identity theft. Indeed, they have been at risk well before Defendant even notified Plaintiff of the breach. Plaintiff also suffered harm in the loss of her and her children's private medical and personal information and the extreme risk of sale of this data to criminals over the dark web, which may have already occurred.

19. Under these circumstances, Defendant unreasonably delayed in notifying individual victims of the specific information that was breached, including for months after it was leaked online to criminal actors. As of September 20, 2024, Defendant has still not identified precisely what information was breached in the attack. This delay in notification to victims of the breach is unacceptable and directly harms victims of the breach, including Plaintiff, by creating uncertainty about the extent to which they have been harmed and the need to engage in various services and efforts in the wake of the data breach, including but not limited to examining whether their PII or PHI has been sold on the dark web, taking measures to protect against

identity theft crimes, expenses, and/or time spent on credit monitoring and identity theft insurance, time spent examining bank statements, time spent initiating fraud alerts, and other consequential harms.

20. Blue Shield cannot abrogate its responsibility to ensure that customer data is protected merely by contracting with third parties to conduct data analysis rather than doing it internally.

21. Plaintiff, individually and on behalf of a nationwide class, alleges claims of (1) Negligence, (2) Breach of Implied Contract, and (3) Unjust Enrichment. Plaintiff also alleges claims on behalf of a California subclass under California law for (4) violation of California's Customer Records Act (Cal. Civ. Code §§ 1798.80, *et seq.*), (5) violation of California's Unfair Competition Law (Cal. Civ. Code §§ 17200, *et seq.*) and (6) violation of California's Confidentiality of Medical Information Act (CMIA) (Cal. Civ. Code § 56.10). Plaintiff also seeks declaratory and injunctive relief. Plaintiff asks the Court to compel Defendant to adopt reasonable information security practices to secure the sensitive PII and PHI that Defendant collects and stores in its databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiff***

22. Plaintiff Alexandra Murillo is a resident of Coronado, California. She brings this case on behalf of herself and her minor children "W.A." and "H.A."

23. Plaintiff Murillo and her children were Blue Shield subscribers and their personal information was exposed as a result of the Young Consulting data breach.

***Defendant***

24. Defendant California Physicians' Service d/b/a Blue Shield of California is a major California health care insurer. As of December 2023, it purported to have 4.8 million

members, 7,119 employees, and over 25 billion dollars in revenue.[7] It operates offices throughout California and its headquarters is at 601 12th Street, Oakland, California 94607.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction and diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The class contains more than 100 members (indeed, it contains nearly one million members), and many of these members have citizenship diverse from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the case in controversy.

26. The exercise of personal jurisdiction over Defendant is appropriate. Blue Shield of California is a California corporation and its principal place of business is in this District.

27. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District. Specifically, Blue Shield's principal place of business is in this district, it is headquartered in this district, it is a California corporation, and Defendant's methodology for assessing vendor security systems, representations, decision-making, and security practices emanated from this District.

28. Divisional Assignment: This action arises in Alameda County, in that a substantial part of the events which give rise to the claims asserted herein occurred in Alameda County, where Defendant is headquartered and located. Pursuant to L.R. 3-2(d), all civil actions that arise in Alameda County and San Francisco County shall be assigned to the San Francisco or Oakland Division.

---

[7] https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf (Last Accessed September 16, 2024)

## FACTUAL ALLEGATIONS

### I. Background

29. Blue Shield is a major California healthcare insurer. It has 4.8 million subscribers (members), 7,119 employees, and in excess of $25 billion in annual revenue as of December 2023.[8]

30. Young Consulting is an Atlanta based Risk Management Company which offers risk management technologies, analysis, and software to insurance companies such as Blue Shield of California.

31. Plaintiff and class members are former or current insured individuals who obtained insurance from Blue Shield of California and had PHI and/or PII exposed as a result of the Young Consulting Data data breach.

32. In order to receive treatment, Plaintiff and members of the Plaintiff class were required to provide all or part of the following non-exclusive list of sensitive PHI and PII during the regular course of business:

- Full name and mailing or personal address,
- State and/or Federal Identification,
- Social Security Number,
- Health insurance information including but not limited to carrier, policy number, and healthcare card,
- Date of birth,
- Medical information including but not limited to information about diagnosis and treatment, personal medical history, family medical history, mental health information, information related to STDs and treatment, medication information, and medical record number,
- Information about physicians and related medical professionals who had been involved in previous or ongoing treatment of the patient,

[8] https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf

- Residence and travel history,
- Billing and claims information including but not limited to information related to credit and debit card numbers, bank account statements and account numbers, and insurance payment details.
- Medicare/Medicaid information.
- Information on prescriptions taken including history of taking certain prescriptions.
- Diagnostic results and treatment information.
- Information on family members including but not limited to emergency contact information and next of kin.
- Personal email addresses and phone numbers.
- Workers' comp and employment related information

33. The above information is extremely sensitive personal identifying information and personal health information (PII and PHI). This information is extremely valuable to criminals because it can be used to commit serious identity theft and medical identity theft crimes.

34. Some or all of this extremely sensitive information was subsequently provided by Blue Shield to Young Consulting. At minimum the information sent to Young Consulting included the subscriber's full name, Social Security number, date of birth, and medical insurance claim information.

## II. The Breach

35. At least as early as April 10, 2024, Young Consulting suffered a massive breach of its systems. It became aware of this breach at least as early as April 13, 2024.

36. On information and belief, Young Consulting became aware of the breach on April 13, 2024 because a third party encrypted its systems through a ransomware attack, and the threat actor notified Young Consulting that they would begin releasing seized information, including PII and PHI identified above, unless they received a ransom.

37. According to reports, no ransom was paid. Subsequently, subscriber data was leaked by the criminal actors starting in May 2024.

38. The data breach impacted nearly one million subscribers. At minimum, the breached data included the subscriber's full name, Social Security number, date of birth, and "insurance policy/claim information." Young Consulting's opaque use of the term "insurance policy/claim information" in its data breach letter does not clarify the scope or scale of the breached information. Moreover, as of the filing of this complaint, Blue Shield has not sent its *own* notification to subscribers whose data was breached, beyond an obscure post on its website, much less clarified the meaning of "insurance policy/claim information."

39. At least as early as June 28, 2024, Young Consulting notified Blue Shield of the breach. This is more than two months after the breach occurred and at least one month after subscriber data was leaked online in May 2024. Given subscriber PII and PHI was actively being leaked online, Blue Shield should have immediately notified subscribers of the danger.

40. However, Blue Shield never sent any notification to subscribers. On August 26, 2024, Young Consulting finally started the process of notifying individual subscribers whose data was compromised in the breach, at which time Blue Shield appears to have updated its website with a very brief notification about the breach.

41. As of September 20, 2024, Blue Shield has not disclosed the precise cause of the data breach, the efforts, if any, Blue Shield has taken to mitigate the harm to subscribers and limit the spread of the leaked data or offered any remedy for impacted subscribers beyond offering 12 months of credit monitoring offered by Young Consulting in some instances.

**III. Defendant Failed to Comply with Cybersecurity Standards**

42. At all times relevant to this Complaint, Defendant knew or should have known the significance and necessity of safeguarding its subscribers' PII and PHI, and the foreseeable consequences of a data breach. Defendant knew or should have known that because it collected and maintained the PII and PHI for a significant number of customers, a significant number of customers would be harmed by a breach of its systems. Defendant further knew due to the nature of its business practices as a major health insurance provider that the data it was entrusted with

was highly valuable and contained private and sensitive information including medical information.

43. Defendant makes numerous data representations on its website concerning the care they take to protect customer data, their use of the data, and privacy policy. Defendant also represents in its 2023 year-end "Mission Report" that it would "carefully [protect] members' data" and that it was a participant in the California Statewide Data Sharing Agreement ("DSA").[9]

44. The DSA contains numerous standards and requirements for Participants, such as Defendant, concerning the use, security procedures, and sharing of individual personal and health information. Blue Shield made public statements concerning their participation in the DSA and indeed is listed as a signatory/participant in the associated California Government Directory.[10]

45. By signing on to the DSA as a Participant and advertising its participation in the program, Defendant represented that it would use and employ data sharing and security practices and procedures consistent with the requirements of the DSA. Defendant therefore had a duty to abide by those same standards.

46. Defendant failed to abide by the DSA standards, and this failure directly harmed Plaintiff and the class. These failures include but are not limited to as follows:

- **Representations and Warranties – *Third Party Technology***

  Pursuant to the DSA Defendant was required to:

  > "[H]ave agreements in place that require Third-Party Technology vendors (i) to provide reliable, stable, and secure services to the Participant [Blue Shield], and (ii) to adhere to the same or similar privacy and security standards applicable to the Participant pursuant to this Agreement"[11]

Young Consulting did not provide sufficiently "secure services," nor did it adhere to the "privacy and security standards applicable to the Participant." Thus, Defendant does not appear to have

---

[9] https://www.blueshieldca.com/content/dam/bsca/en/member/docs/Blue-Shield-of-California-2023-Mission-Report.pdf

[10] *See* https://www.cdii.ca.gov/wp-content/uploads/2023/06/DxF_DSA_SignatoryList.xlsx

[11] https://www.cdii.ca.gov/wp-content/uploads/2023/01/1.-CalHHS_DSA_Final_v1_7.1.22-11.8.22.pdf

complied with the requirement for representations and warranties applicable to Third Party Technology providers, such as Young Consulting.

- **Minimum Necessary Information Disclosure**

Defendant also agreed that "Any use or disclosure of PHI or PII pursuant to this Agreement will be limited to the minimum PHI or PII necessary to achieve the purpose for which the information is shared"[12] For risk management purposes, such as the work conducted by Young Consulting, the "Minimum Necessary Disclosure" could and should have included the anonymization of customer data including names, dates of birth, and Social Security numbers, which may not be necessary for this purpose. Additionally, it is not clear exactly what data was disclosed from the "insurance policy/claim information," but on information and belief, this information went well beyond the minimum necessary information disclosure. Plaintiff's investigation has revealed that many of the subscribers whose data was breached had not been subscribed to Blue Shield for some time or were otherwise former subscribers. The information leaked, including PHI and PII, cannot be a *necessary* disclosure to a third party when the information in question may be referring to old or former customers.

- **Data Breach Notification Requirements:**

The DSA sets forth several Data Breach Notification requirements, *all* of which Defendant is apparently in violation of as Defendant never sent a data breach notification itself. Moreover, to the extent that the notification sent by Young Consulting relates to this Data Breach, it is deficient under the DSA. Most of the data breach notification requirements are laid out by subsection on "Breach Notification" which became effective on January 31, 2024.[13] Specifically, Defendant failed to do the following:

    - "As soon as reasonably practicable after discovering a breach has occurred … a participant shall notify CDII and all Participants impacted by the breach."

---

[12] https://www.cdii.ca.gov/wp-content/uploads/2023/01/1.-CalHHS_DSA_Final_v1_7.1.22-11.8.22.pdf
[13] https://www.cdii.ca.gov/wp-content/uploads/2023/12/CalHHS_Breach-Notification-PP_Final_v1.0.1_12.11.23.pdf

    - At best, Defendant waited at least two months after they were notified of the breach to send any kind of notification to impacted members (the notification was sent by Young Consulting).

  - "As soon as reasonably practicable after discovering a Breach has occurred… a Participant shall provide a written report of the Breach to all Participants impacted by the Breach. The Participant shall supplement the information contained in the written report as it becomes available and shall cooperate with other impacted Participants… Such written report should include, to the extent available, the following information:

    i. One or two sentence description of the breach

    ii. Description of the roles of the people involved in the Breach (e.g., employees, service providers, unauthorized persons);

    iii. The type of Health and Social Services Information Breached;

    iv. Participants likely impacted by the Breach;

    v. Number of individuals or records impacted/estimated to be impacted by the breach;

    vi. Actions taken by the participant to mitigate the Breach;

    vii. Current status of the Breach (under investigation or resolved); and

    viii. Corrective action taken and steps planned to prevent a similar Breach"[14]

47. Defendant does not appear to have provided any of the required information outlined above to subscribers except insofar as the Young Consulting Data Breach letter provided a one or two sentence description of the breach. The description of the roles of the people involved in the breach including employees, service providers, and unauthorized persons was not disclosed. The type of health and personal information, other than in extremely general terms, was not disclosed. The number of individuals impacted was not disclosed in the letter. The actions Blue Shield is taking to mitigate the breach were not disclosed, the current status of the breach was not fully disclosed, and Blue Shield did not outline any corrective action taken or steps planned to prevent a similar breach in the future.

[14] https://www.cdii.ca.gov/wp-content/uploads/2023/12/CalHHS_Breach-Notification-PP_Final_v1.0.1_12.11.23.pdf (Last Accessed September 16, 2024)

48. A reasonable data breach letter would have provided at minimum the information listed above. Blue Shield's failure to provide virtually all of the reasonably required information to participants in its healthcare plans has hampered the ability for Plaintiff and the class to effectively respond to the breach and has created confusion, stress, and has otherwise harmed the class.

49. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

50. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[15] The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

51. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

52. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

53. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures

[15] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last accessed March 21, 2024)

to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

54. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

55. Defendant knew or should have known of its obligation to implement appropriate measures to protect its customers' PII but failed to comply with the FTC's basic guidelines and other industry best practices, including the minimum standards set by the National Institute of Standards and Technology Cybersecurity Framework Version 1.1.[16]

56. Defendant's failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

57. Defendant failed to ensure its service provider was employing reasonable care in maintaining the privacy and security of Plaintiff's and Class Members' PII and PHI. If Defendant had implemented adequate security and monitoring measures, cybercriminals could never have accessed the PII of Plaintiff and Class Members, and the Data Breach would have either been prevented in its entirety or have been much smaller in scope. For example, if Defendant had provided only the minimum required information to Young Consulting, the scope of the data breach may have been diminished significantly. Likewise, if Defendant had implemented adequate monitoring systems, it could have determined that Young Consulting had insufficient security practices and/or noticed that information was being leaked online back in May 2024 and taken corrective action. Under normal circumstances, no individual should ever be able to download or otherwise access PII and PHI for hundreds of thousands of individuals, and an attempt to access even a tiny fraction of that information from the subscriber database should have been stopped and flagged much earlier.

58. Once Defendant became aware of the breach, they could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms,

[16] https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf. (last accessed March 21, 2024)

including sending notifications to those impacted of exactly what data was taken. Delaying *at least* two months after being notified of the breach and nearly four months *after the breach had initially occurred* to inform subscribers of the breach is not "as soon as practicable" as Defendant had agreed to do.

59. Personally Identifiable Information is of high value to criminals. Sensitive information can often be sold on the dark web, with personal information being sold at a price ranging from $40 to $200 and bank details with a price from $50 to $200.[17] The Data Breach exposed PII that is both valuable and highly coveted on underground markets because it can be used to commit identity theft and financial fraud. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves will also re-use stolen PII and PHI, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII and PHI.

60. Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[18] Plaintiff and members of the class generally have spent hours on end and considerable time and stress in attempting to mitigate the present and future harms caused by the breach. The U.S. Department of Justice's

---

[17] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed September 6, 2024).

[18] https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf. (last accessed September 6, 2024)

Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[19]

61. The information compromised in the Data Breach—including detailed medical information—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts Defendant customers and patients at additional risk for potential medical fraud and medical identity theft.

62. Data breaches involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[20] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[21] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

63. Security standards for businesses storing PII and PHI commonly include, but are not limited to:

a. Maintaining a secure firewall

b. Monitoring for suspicious or unusual traffic on the website

c. Looking for trends in user activity including for unknown or suspicious users

d. Looking at server requests for PII

e. Looking for server requests from VPNs and Tor exit notes

---

[19] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last accessed September 6, 2024)

[20] *See What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 22, 2023).

[21] *Id*

f. Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII

g. Structuring a system including design and control to limit user access as necessary including a user's access to the account data and PII of other users.

64. Defendant had a duty to ensure that not only did they themselves comply with all these reasonable security measures, but to also ensure that their contractors met the same standards. Defendant had an obligation to provide superior security in light of the sensitivity of the information they administered and to ensure that they did not inappropriately abrogate that obligation by hiring third party contractors with insufficient security practices. Defendant failed to meet this standard.

**IV. Plaintiff's and Class Members' Experiences**

65. To use Defendant's Service, Plaintiff provided sensitive PII and PHI including her full name, address, date of birth, Social Security number, medical records, insurance information, billing, banking, and credit card information, family medical history, and more. She also provided relevant information with respect to her minor children. Although Defendant has not clarified specifically what information was compromised beyond her and children's names, Social Security numbers, dates of birth, and the omnibus insurance claims information catch-all, the granularity of the breached data appears to be very high. The insurance information referenced may include but not be limited to: patient name and contact information including mail address, email address, and phone number; state and/or federal identification; health insurance information including healthcare cards; medical information including information related to medical history, diagnosis, and treatment; information about treating physicians and medical professionals; billing and claims information including payment details; medication and prescription history; mental health information, contact information for family members including full names, personal relationship, and phone number; Medicare/Medicaid information; workers comp or employment related information; and more.

66. Plaintiff has taken reasonable steps to maintain the confidentiality of her PII and PHI. When Defendant accepted its duty to store and analyze data from the healthcare companies

it did so with the implicit understanding it would be required to use its experience and sophistication to keep this information secure and confidential.

67. As a result of the data breach, Plaintiff was forced to take measures to mitigate the harm, including spending time monitoring credit and financial accounts, researching the Data Breach, and researching and taking steps to prevent and mitigate the likelihood of identity theft. She also must take steps to ensure that her minor children are protected against the risk of lingering harm caused by the data breach.

68. As a result of the Data Breach, Plaintiff suffered actual injuries including: (a) damages to and diminution in the value of Plaintiff's PII and PHI—property that Plaintiff entrusted to Defendant as a condition of receiving its services; (b) loss and invasion of Plaintiff's privacy; and (c) injuries arising from the increased risk of fraud and identity theft, including the cost of taking reasonable identity theft protection measures, which will continue for years.

## CLASS ACTION ALLEGATIONS

69. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Nationwide Class defined as follows:

> **All current and former Blue Shield of California subscribers in the United States whose PII and/or PHI were compromised by the Data Breach announced by Young Consulting in August 2024.**

70. Within the Nationwide class there is one California Subclass defined as follows:

> **All current and former Blue Shield of California subscribers who are California Residents and whose PII and/or PHI was compromised by the Data Breach announced by Young Consulting in August 2024.**

71. Excluded from the Nationwide Class and Subclass are governmental entities, Defendant, any entity in which Defendant have a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries,

and assigns. Also excluded from the Nationwide Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

72. This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

73. **Numerosity.** The Nationwide Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Nationwide Class Members is currently unknown and can only be ascertained through appropriate discovery, Plaintiff, on information and belief, allege that the Nationwide Class includes at least hundreds of thousands of members based on Defendant's own representation that information from more than 950,000 subscribers was compromised.

74. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a. Whether Defendant knew or should have known that its contractor's systems were vulnerable to unauthorized access;

b. Whether Defendant failed to take adequate and reasonable measures to ensure its contractor's data systems were protected;

c. Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

d. Whether Defendant unreasonably delayed in notifying subscribers of the harm they suffered once the suspicious activity was detected.

e. Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII and PHI;

f. Whether Defendant breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII and PHI;

g. Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

h. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

75. **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

76. **Adequacy of Representation.** Plaintiff is an adequate class representative because she is a Nationwide Class Member, and her interests do not conflict with the Class interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and her counsel intend to prosecute this action vigorously for the Class' benefit and will fairly and adequately protect their interests.

77. **Predominance and Superiority.** The Nationwide Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class member's claim is impracticable. Even if each Class member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

78. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for

Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendant have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiff and the Nationwide Class

79. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

80. Plaintiff was required to provide PII and PHI as a precondition for receiving insurance services from Defendant. Plaintiff and Class Members entrusted their PII and PHI to Defendant with the understanding that it would safeguard their PII and PHI.

81. Defendant likewise made numerous representations about its data security practices including that it was a participant in the California Statewide Data Sharing Agreement ("DSA"), which provides certain data sharing requirements and standards.

82. Defendant did not take reasonable and appropriate safeguards to protect Plaintiff and Class Members' PII and PHI.

83. Defendant violated its obligations under the DSA as outlined on Defendant's website. Defendant also did not vet or otherwise sufficiently verify that its third-party contractor, Young Consulting, used and maintained adequate security practices.

84. Defendant had full knowledge of the sensitivity of the PII and PHI that it stored and the types of harm that Plaintiff and Class Members could and would suffer if that PII and PHI were wrongfully disclosed.

85. Defendant violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendant's and Defendant's contractors information security controls sufficiently rigorously to ensure that PII and PHI in its possession was adequately secured by, for example,

encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify patients of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

86. Defendant's duty of care arose from, among other things,

a. Defendant's exclusive ability (and Class Members' inability) to ensure that its systems and its contractor's systems were sufficient to protect against the foreseeable risk that a data breach could occur;

b. Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

c. Defendant's participation in the DSA, including its assent to follow numerous data security measures outlined in the agreement.

d. Defendant's common law duties to adopt reasonable data security measures to protect customer PII and PHI and to act as a reasonable and prudent person under the same or similar circumstances would act.

87. Defendant's violation of the FTC Act constitutes negligence per se for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belong and to prevent the types of harm that resulted from the Data Breach.

88. Likewise, the DSA expressly discusses the risk of data breaches in the health industry and the impact that exposure of this information may have on individual subscribers. One of the plain purposes of the DSA is to ensure insurers, like Defendant, follow and enact sufficient data security practices and procedures.

89. Defendant processes sensitive information for millions of subscribers and has annual revenue in the tens of billions of dollars. Defendant had the financial and personnel resources necessary to prevent the Data Breach. Defendant nevertheless failed to adopt

reasonable data security measures, in breach of the duties it owed to Plaintiff and Class Members.

90. Plaintiff and Class Members were the foreseeable victims of Defendant's inadequate data security. Defendant knew that a breach of its systems or its contractors' systems could and would cause harm to Plaintiff and Class Members.

91. Defendant's conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately mitigate harm through negligently failing to inform patients and victims of the breach of the specific information breached for (as of time of writing) more than four months after the purported first discovery of the breach.

92. Defendant knew or should have known of the inherent risks in collecting and storing massive amounts of PII and PHI, the importance of providing adequate data security for that PII and PHI, and the frequent cyberattacks within the insurance industry, particularly given its specialization in risk management.

93. Defendant, through its actions and inactions, breached its duty owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII and PHI while it was in its possession and control. Defendant breached its duty by, among other things, their failure to adopt reasonable data security practices and their failure to adopt reasonable security and notification practices, including monitoring internal systems and sending notifications to affected victims. Defendant failed to timely notice Plaintiff and Class Members of suspicious activities and failed to implement sufficiently stringent security measures.

94. Defendant inadequately safeguarded consumers' PII and PHI in breach of standard industry rules, regulations, and best practices at the time of the Data Breach. Defendant also breached its duties as outlined by the DSA.

95. But for Defendant's breach of its duty to adequately protect Class Members' PII and PHI, Class Members' PII and PHI would not have been stolen.

96. There is a temporal and close causal connection between Defendant's failure to implement adequate data security measures and notification practices, the Data Breach, and the harms suffered by Plaintiff and Class Members.

97. As a result of Defendant's negligence, Plaintiff and Class Members suffered and will continue to suffer the damages alleged herein.

98. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

**Count 2**
**Breach of Implied Contract**
**On behalf of Plaintiff and the Nationwide Class**

99. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

100. Plaintiff and Class Members were required to provide sensitive personal and health information to Defendant as a precondition for receiving health insurance services. As part of this exchange, there was an implied contract with Defendant when Defendant accepted custody of their PII and PHI.

101. As part of these transactions, Defendant agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII or PHI was breached or compromised.

102. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendant's own representations. Plaintiff and Class Members believed that Defendant would use part of the monies paid to Defendant under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

103. Plaintiff and Class Members would not have provided and entrusted their PII and PHI to Defendant or would have paid less for Defendant's products or services in the absence of the implied contract or implied terms between them and Defendant. The safeguarding of the PII and PHI of Plaintiff and Class Members was critical to realize the intent of the parties.

104. Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

105. Defendant breached their implied contracts with Plaintiff and Class Members to protect their PII and PHI when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) disclosed that information to unauthorized third parties and; (3) failed to notify Plaintiff and Class Members of the specific data breached in a reasonably timely manner.

106. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

107. As a direct and proximate result of the breach, Plaintiff and class members are entitled to relief as set forth herein.

**Count 3**
**Unjust Enrichment**
**On behalf of Plaintiff and the Nationwide Class**

108. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

109. This count is brought in the alternative to Plaintiff's breach of third-party beneficiary contract count.

110. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Defendant should have provided adequate data security for Plaintiff and Class Members.

111. Defendant knew that Plaintiff and Class Members conferred a benefit on it in the form of their Private Information as a necessary part of their receiving healthcare services. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

112. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by Plaintiff and Class Members. As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

113. Defendant, however, failed to secure Plaintiff and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

114. Defendant would not be able to carry out an essential function of its regular business without the Private Information of Plaintiff and Class Members and derived revenue by using it for business purposes. Plaintiff and Class Members expected that Defendant or anyone in

Defendant's position would use a portion of that revenue to fund adequate data security practices.

115. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

116. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, including by not reasonably ensuring the security of contractors Defendant utilized, they would not have provided their Private Information to Defendant.

117. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and cheaper contractors and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

118. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

119. Plaintiff and Class Members have no adequate remedy at law.

120. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent

in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

121. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members were underpaid by Defendant.

**Count 4**
**California Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.***
**On behalf of Plaintiff and the California Subclass Class**

122. Plaintiff, individually and on behalf of the Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

123. "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

124. Defendant is a business that owns, maintains, or licenses personal information, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff and California Subclass members.

125. Defendant violated Cal. Civ. Code § 1798.81.5 by failing to implement reasonable measures to protect California Subclass members' PII and PHI.

126. Businesses that own or license computerized data that includes personal information are required to notify California residents when their PII and PHI has been acquired (or has reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

127. Defendant is a business that owns or licenses computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82.

128. Plaintiff and California Subclass Members' PII and PHI includes personal information identified in Cal. Civ. Code § 1798.82(h) such as their names, Social Security numbers, address and date of birth, and health insurance information, and is thereby covered by Cal. Civ. Code § 1798.82.

129. Plaintiff and the California Subclass Members are "customers" within the meaning of Cal. Civ. Code § 1798.80(c), as their personal information was provided to Defendant for the purpose of utilizing Defendant's healthcare insurance services.

130. The Data Breach constituted a breach of Defendant's security systems, networks, and servers.

131. Because Defendant reasonably believed that Plaintiff and California Subclass Members' PII and PHI was acquired by unauthorized persons during the Data Breach, Defendant had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

132. Defendant unreasonably delayed informing Plaintiff and the California Subclass Members about the breach of security of their PII and PHI after they knew the breach had occurred. Specifically, Defendant knew about the data breach at least as early as June 2024, but never notified Plaintiff or Subclass Members, who were only informed of the breach two months later by Young Consulting.

133. Upon information and belief, no law enforcement agency instructed Defendant that notification to California Subclass Members would impede an investigation.

134. Thus, by failing to disclose the Data Breach in a timely and accurate manner, the Defendant also violated Cal. Civ. Code § 1798.82.

135. Pursuant to Cal. Civ. Code § 1798.84, "[a]ny waiver of a provision of this title is contrary to public policy and is void and unenforceable," "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," and "[a]ny business that violates, proposed to violate, or has violated this title may be enjoined."

136. As a direct and proximate result of Defendant's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff and California Subclass Members were (and continue to be) injured and suffered (and will continue to suffer) damages, as described above.

137. Plaintiff and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including, but not limited to, actual damages, any applicable statutory damages, and equitable and injunctive relief.

**Count 5**
**California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**On behalf of Plaintiff and the California Subclass Class**

138. Plaintiff, individually and on behalf of the Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

139. Plaintiff pleads this claim for equitable relief, including restitution and injunctive relief, in the alternative to her claims for damages.

140. Defendant violated California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, by engaging in unlawful, unfair, or fraudulent business acts and practices that constitute acts of "unfair competition" as defined in the UCL with respect to their conduct and actions with towards Plaintiff and the California Subclass.

141. Defendant's actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* because

Defendant's actions: (a) violated the California Consumer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*, (b) constituted negligence; and (c) violated federal law and regulations, including the FTC Act and HIPAA.

142. Defendant's actions as alleged in this Class Action Complaint also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious. The harm caused by Defendant's wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the California Subclass, including Plaintiff Murillo. There were ample reasonably available alternatives that would have furthered Defendant's legitimate business practices, including using industry-standard technologies to protect data (e.g., two-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for Defendant's services). Defendant also unreasonably delayed in notifying Plaintiff and the California Subclass Members regarding the unauthorized release and disclosure of their PII and PHI. Additionally, Defendant's conduct was "unfair" because it violated the legislatively declared policies reflected by California's strong data-breach and online-privacy laws, including the California Consumer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, and the California's Confidentiality of Medical Information Act (CMIA)(Cal. Civ. Code § 56.10).

143. As a result of Defendant's unlawful and unfair conduct, Plaintiff and the California Subclass were damaged and injured by the significant costs of protecting themselves from identity theft and face ongoing and impending damages related to theft of their PII and PHI.

144. Defendant's wrongful practices constitute a continuing course of unfair competition because, on information and belief, Defendant has failed to remedy the lax security practices or even fully notify all affected California persons. Plaintiff and the California Subclass seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendant's wrongful practices and require Defendant to maintain adequate and reasonable security measures to protect the PII and PHI of Plaintiff and the California Subclass.

145. Plaintiff and California Subclass Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud, as well as long term incalculable risk associated with medical fraud.

146. Further, if an injunction is not issued, Plaintiff and California Subclass Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Defendant has still not provided adequate information on the cause and scope of the Data Breach. Plaintiff and California Subclass Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

147. Plaintiff and the California Subclass also seek an order requiring Defendant to make full restitution of all monies it received through its wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

**Count 6**
**Confidentiality of Medical Information Act (CMIA) (Cal. Civ. Code § 56.06)**
**On behalf of Plaintiff and the California Subclass**

148. Plaintiff, individually and on behalf of the Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

149. Defendant is a provider of healthcare under Cal. Civ. Code § 56.06, subdivisions (a) and (b), because it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

150. Defendant is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

151. The CMIA defines medical information as meaning any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan,

pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." The information Defendant maintained and disclosed is medical information because "insurance policy/claim information" provides information about a subscriber's medical history, and was individually identifiable because it included information, including the subscriber's full name, Social Security number, and date of birth, which "alone or in combination with other publicly available information reveals the identity of the individual."

152. Defendant violated Cal. Civ. Code Section 53.06(e) because it did not maintain the confidentiality of Plaintiff and Subclass members' medical information. This identifiable information was shared with third parties, including criminal threat actors and hackers, which are now selling the information on the dark web. This disclosure was not authorized by the individual.

153. This negligent disclosure is in violation of Cal. Civ. Code Section 56.06(e) Accordingly, Plaintiff and Subclass members are entitled to: (1) nominal damages of $1,000 per violation pursuant to Cal. Civ. Code Section 53.36(b); (2) actual damages, in an amount to be determined at trial; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**Count 7**
**Injunctive/Declaratory Relief**
**On behalf of Plaintiff and the Nationwide Class**

154. Plaintiff incorporates by reference and realleges each allegation in paragraphs 1-77 as though fully set forth herein.

155. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

156. Defendant owes a duty of care to Plaintiff and Class Members, which required Defendant to adequately monitor and safeguard Plaintiff's and Class Members' PII and PHI.

157. Defendant and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII and PHI belonging to Plaintiff and Class Members.

158. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the exposure of their PII and PHI and the risk remains that further compromises of their private information will occur in the future.

159. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure the PII and PHI of Plaintiff and the Class within its care, custody, and control under the common law, Section 5 of FTC Act, and HIPAA;

b. Defendant breached its duty to Plaintiff and the Class by allowing the Data Breach to occur;

c. Defendant's existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII and PHI of Plaintiff and the Class within Defendant's custody, care, and control; and

d. Defendant's ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

160. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect the PII and PHI of Plaintiff and the Class within its custody, care, and control, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendant's obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

   i. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems, networks, and servers on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

   ii. Encrypting and anonymizing the existing PII and PHI within their servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendant to provide adequate services;

   iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

   iv. Auditing, testing, and training its security personnel regarding any new or modified procedures;

   v. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems, networks, and servers;

   vi. Conducting regular database scanning and security checks; and

   vii. Routinely and continually conducting internal training and education to inform Defendant's internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

161. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

162. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages and or additional data breaches and exposure if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a preexisting legal obligation to employ such measures.

163. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent or larger data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII and PHI would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and their counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the PII and PHI of Plaintiff and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F. That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G. That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: September 20, 2024

Respectfully submitted,

/s/ Amber L. Schubert

Robert C. Schubert (SBN 62684)
Amber L. Schubert (SBN 278696)
Daniel L.M. Pulgram (SBN 354569)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
rschubert@sjk.law
aschubert@sjk.law
dpulgram@sjk.law

*Counsel for Plaintiff and the Proposed Classes*